1
2
3
4
5
6
7
8              UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11  KATHERINE DOUNCE,                    No.  2:24-cv-2518 AC

12              Plaintiff,

13       v.                              **ORDER**

14  COMMISSIONER OF SOCIAL
    SECURITY,
15
                Defendant.
16

17

18         Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security

19  ("Commissioner"), denying her application for disability insurance benefits ("DIB") under

20  Title II of the Social Security Act, 42 U.S.C. §§ 401-34, and for Supplemental Security Income

21  ("SSI") under Title XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 1381-1383f.[1]  For

22  the reasons that follow, plaintiff's motion for summary judgment will be GRANTED, and

23  defendant's cross-motion for summary judgment DENIED.

24  ////

25  ─────────────────
    [1]  DIB is paid to disabled persons who have contributed to the Disability Insurance Program, and
26  who suffer from a mental or physical disability.  42 U.S.C. § 423(a)(1); Bowen v. City of New
    York, 476 U.S. 467, 470 (1986).  SSI is paid to financially needy disabled persons.  42 U.S.C.
27  § 1382(a); Washington State Dept. of Social and Health Services v. Guardianship Estate of
    Keffeler, 537 U.S. 371, 375 (2003) ("Title XVI of the Act, § 1381 et seq., is the Supplemental
    Security Income (SSI) scheme of benefits for aged, blind, or disabled individuals, including
28  children, whose income and assets fall below specified levels . . .").

1

1           I.  PROCEDURAL BACKGROUND

2           Plaintiff applied for both DIB and SSI on September 24, 2021, alleging disability

3    beginning December 30, 2020.  AR 74.[2]  The application was disapproved initially on December

4    8, 2021, and after reconsideration on February 7, 2022.  Id.  On August 3, 2023, ALJ Paul Barker

5    presided over the telephonic hearing on plaintiff's challenge to the disapprovals.  AR 156-209

6    (transcript).  Plaintiff, who appeared with Klade Harmon as counsel, testified at the hearing.  AR

7    161.  William Cody, a Vocational Expert ("VE"), also testified.  AR 201.

8           On October 13, 2023, the ALJ found plaintiff "not disabled" under sections 216(i) and

9    223(d) of Title II of the Act, 42 U.S.C. §§ 416(i), 423(d), and section 1614(a)(3)(A) of Title XVI

10   of the Act, 42 U.S.C. § 1382c(a)(3)(A).  AR 74-92 (decision), 93-100 (exhibit list).  On July 18,

11   2024, after receiving Exhibit 26B, a Request for Review dated November 17, 2023; Exhibit 28E,

12   a Representative Brief dated March 15, 2024; and Exhibit 29E, plaintiff's undated letter

13   submitted with the Request for Review, the Appeals Council upheld the ALJ's decision as the

14   Commissioner of Social Security's final decision.  AR 1-6 (decision and additional exhibit list).

15          Plaintiff filed this action on September 17, 2024.  ECF No. 1; see 42 U.S.C. § 405(g).

16   The parties consented to the jurisdiction of the magistrate judge.  ECF Nos. 4-6.  The parties'

17   cross-motions for summary judgment, based on the Administrative Record filed by the

18   Commissioner, have been briefed.  ECF Nos. 11-12 (copies of plaintiff's summary judgment

19   motion), 14 (defendant's summary judgment motion).  Plaintiff also filed two copies of her reply

20   brief in March 2025.  ECF Nos. 15-16.

21          II.  FACTUAL BACKGROUND

22          Plaintiff was born in 1990 and accordingly was, at age 30, a younger individual as of her

23   alleged onset date.  AR 90; see 20 C.F.R. § 404.1563(c).  Plaintiff finished three years of college

24   and can read and write simple messages in English.  AR 496.  She worked as an account

25   executive from June 2011 to November 2012, a sales development representative from January to

26   November 2013, an education activity coordinator from June 2015 to August 2016, an executive

27   assistant from August 2018 to March 2019, and an office services technician from March to June

28   _____
     [2]  Two copies of the AR are electronically filed, collectively as ECF No. 7 (AR 1 to AR 3153).

2020.  AR 498.  Reported medical conditions include lupus, narcolepsy with cataplexy, extreme fatigue, fibromyalgia, muscle weakness, lack of energy, and an inability to walk much.  AR 497.

## III.  LEGAL STANDARDS

The Commissioner's decision that a claimant is not disabled will be upheld "if it is supported by substantial evidence and if the Commissioner applied the correct legal standards." Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1011 (9th Cir. 2003).  "'The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive . . ..'"  Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995) (quoting 42 U.S.C. § 405(g)).

Substantial evidence is "more than a mere scintilla," but "may be less than a preponderance."  Molina v. Astrue, 674 F.3d 1104, 1110-11 (9th Cir. 2012).  "It means such evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal quotation marks omitted).  "While inferences from the record can constitute substantial evidence, only those 'reasonably drawn from the record' will suffice."  Widmark v. Barnhart, 454 F.3d 1063, 1066 (9th Cir. 2006) (citation omitted). Although this court cannot substitute its discretion for that of the Commissioner, the court nonetheless must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the [Commissioner's] conclusion."  Desrosiers v. Secretary of HHS, 846 F.2d 573, 576 (9th Cir. 1988); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985) ("The court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion; it may not affirm simply by isolating a specific quantum of supporting evidence.").

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities."  Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001).  "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."  Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002).  However, the court may review only the reasons stated by the ALJ in his decision "and may not affirm the ALJ on a ground upon which he did not rely."  Orn v. Astrue, 495 F.3d 625, 630 (9th Cir. 2007); Connett v. Barnhart, 340 F.3d 871, 874 (9th Cir. 2003) ("It was error for the district court to affirm the ALJ's credibility decision based on

3

1  evidence that the ALJ did not discuss").

2       The court will not reverse the Commissioner's decision if it is based on harmless error,

3  which exists only when it is "clear from the record that an ALJ's error was 'inconsequential to the

4  ultimate nondisability determination.'" Robbins v. Soc. Sec. Admin., 466 F.3d 880, 885 (9th Cir.

5  2006) (quoting Stout v. Commissioner, 454 F.3d 1050, 1055 (9th Cir. 2006)); see also Burch v.

6  Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).

7                          IV.  RELEVANT LAW

8       DIB and SSI are available for every eligible individual who is "disabled."  42 U.S.C.

9  §§ 423(a)(1)(E) (DIB), 1381a (SSI).  Plaintiff is "disabled" if she is unable to "engage in any

10  substantial gainful activity by reason of any medically determinable physical or mental

11  impairment which can be expected to result in death or which has lasted or can be expected to last

12  for a continuous period of not less than 12 [twelve] months[.]"  42 U.S.C. §§ 423(d)(1)(A),

13  1382c(a)(3)(A); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

14       The Commissioner uses a five-step sequential evaluation process to determine whether an

15  applicant is disabled and entitled to benefits.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4);

16  Barnhart v. Thomas, 540 U.S. 20, 24-25 (2003) (setting forth the "five-step sequential evaluation

17  process to determine disability" under Title II and Title XVI).  The following summarizes the

18  sequential evaluation:

19          Step one: Is the claimant engaging in substantial gainful activity?  If
            so, the claimant is not disabled.  If not, proceed to step two.
20
21  20 C.F.R. §§ 404.1520(a)(4)(i), (b) and 416.920(a)(4)(i), (b).

22          Step two: Does the claimant have a "severe" impairment?  If so,
            proceed to step three.  If not, the claimant is not disabled.

23  Id., §§ 404.1520(a)(4)(ii), (c) and 416.920(a)(4)(ii), (c).

24          Step three: Does the claimant's impairment or combination of
            impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404,
25          Subpt. P, App. 1?  If so, the claimant is disabled.  If not, proceed to
            step four.
26
    Id., §§ 404.1520(a)(4)(iii), (d) and 416.920(a)(4)(iii), (d).
27
            Step four: Does the claimant's residual functional capacity make him
28          capable of performing his past work?  If so, the claimant is not

                                       4

1

disabled.  If not, proceed to step five.

2

Id., §§ 404.1520(a)(4)(iv), (e), (f) and 416.920(a)(4)(iv), (e), (f).

3

Step five: Does the claimant have the residual functional capacity perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.

4

5

Id., §§ 404.1520(a)(4)(v), (g) and 416.920(a)(4)(v), (g).

6

The claimant bears the burden of proof in the first four steps of the sequential evaluation

7

process.  20 C.F.R. §§ 404.1512(a) ("In general, you have to prove to us that you are blind or

8

disabled"), 416.912(a) (same); Bowen, 482 U.S. at 146 n.5.  However, "[a]t the fifth step of the

9

sequential analysis, the burden shifts to the Commissioner to demonstrate that the claimant is not

10

disabled and can engage in work that exists in significant numbers in the national economy."  Hill

11

v. Astrue, 698 F.3d 1153, 1161 (9th Cir. 2012); Bowen, 482 U.S. at 146 n. 5.

12

V.  THE ALJ's DECISION

13

The ALJ made the following findings:

14

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2026[…].

15

16

2.  The claimant has not engaged in substantial gainful activity since December 30, 2020, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

17

18

3. The claimant has the following severe impairments: narcolepsy with cataplexy; systemic lupus erythematosus; discoid lupus erythematosus; undifferentiated connective tissue disorder; chronic pain syndrome; degenerative disc disease of the cervical spine with cervical radiculopathy; and borderline personality disorder (20 CFR 404.1520(c) and 416.920(c)).

19

20

21

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

22

23

24

5. After careful consideration of the entire record, the [ALJ found] that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can lift and carry, push and pull twenty pounds occasionally and ten pounds frequently, and she can stand and walk for six hours of an eight-hour workday with standard breaks, and for thirty minutes at one time, with the option to sit at the workstation and continue working for ten minutes after thirty minutes of standing or walking. The claimant can sit for six hours of an eight-hour workday with

25

26

27

28

5

standard breaks, and she can occasionally stoop, balance, kneel, crawl, and crouch. The claimant can occasionally climb ramps and stairs, but she can never climb ladders, ropes, or scaffolds. The claimant must never be exposed to unprotected heights or dangerous, unprotected machinery, and she can understand, remember, and carry out simple tasks and make simple work-related decisions. The claimant can have occasional work-related interactions with coworkers and supervisors, and she can have rare work-related interaction with the general public (five percent or less of an eight-hour workday). The claimant can have occasional changes in the work setting.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on May 9, 1990, and was 30 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from December 30, 2020, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

AR 76-91.

As noted, the ALJ concluded that plaintiff was "not disabled" during the disputed period under Titles II and XVI of the Act. AR 92.

## VI. ANALYSIS

A. The ALJ's Discussion of Severe Impairments at Step Three Was Inadequate

1. Lupus and Connective Tissue Disease

Appendix 1 to Subpart P of the regulations ("Appendix 1") defines systemic lupus erythematosus ("SLE") as a "chronic inflammatory disease" that affects any combination of major organ or body systems. 20 C.F.R. Subpar. P, App. 1, § 14.00(D)(1)(a). The disease can,

6

1  but will not necessarily, include constitutional symptoms like "severe fatigue, fever, malaise, [or]

2  involuntary weight loss". Id.

3      Appendix 1 defines "undifferentiated and mixed connective tissue disease" (collectively

4  "CTD") to include any "syndrome[] with clinical and immunologic features of several

5  autoimmune disorders" that does not satisfy the criteria of a disorder otherwise specified in

6  Appendix 1. Id. at § 14.00(D)(5)(a). Whereas undifferentiated CTD is diagnosed when the

7  clinical and serologic findings are consistent with autoimmune diseases but do not meet the

8  criteria of any one disease, mixed CTD ("MCTD") is diagnosed when these findings reflect an

9  overlap of two or more autoimmune diseases. Id. at § 14.00(D)(5)(b).

10     Listings 14.02 and 14.06 list two scenarios where a claimant with SLE or either form of

11 CTD is automatically disabled, in both of which the claimant manifests two of the four specified

12 constitutional symptoms. Id. at §§ 14.02(A)(2), (B), 14.06(A)(2), (B). Under Paragraph A, a

13 claimant must also demonstrate that the SLE or CTD affects two or more organ or body systems,

14 one of which to a "moderate level of severity". Id. at §§ 14.02(A)(1), 14.06(A)(1). Paragraph B

15 instead requires repeat manifestations of the condition and "marked" limitation in performing

16 activities of daily living, maintaining social functioning, or "completing tasks in a timely manner

17 due to deficiencies in concentration, persistence, or pace." Id. at §§ 14.02(B), 14.06(B).

18     After reciting each Paragraph's requirements, the ALJ concluded that plaintiff's condition

19 did not meet the Appendix 1 requirements for either Listing. AR 78. As to the broad areas of

20 functioning, the ALJ found a moderate limitation in interacting with others and in adapting or

21 managing oneself, and a mild limitation in understanding, remembering or applying information

22 and in concentrating, persisting, or maintaining pace. AR 79.

23     2. Governing Legal Principles

24     At step three of the sequential evaluation, a finding of disability is compelled where the

25 claimant's impairment or combination of impairments meets or equals an impairment listed in

26 Appendix 1. 20 C.F.R. §§ 404.1520(a)(4)(iii), (d). Each Listing sets forth the specific

27 "symptoms, signs, and laboratory findings" which must be established for a claimant's

28 impairment to meet the Listing. Tackett v. Apfel, 180 F.3d 1094, 1099 (9th Cir. 1999). The

7

1   plaintiff bears the burden of proving that she meets each criterion in the listing for that

2   impairment. Burch, 400 F.3d at 683. The burden for this showing is high because the listings in

3   Appendix 1 were "designed to operate as a presumption of disability that makes further inquiry

4   unnecessary." Kennedy v. Colvin, 738 F.3d 1172, 1176 (9th Cir. 2013) (quoting Sullivan v.

5   Zebley, 493 U.S. 521, 532 (1990)). The ALJ's findings, however, "must evaluate the relevant

6   evidence before concluding that a claimant's impairments do not meet or equal a listed

7   impairment." Lewis v. Apfel, 236 F.3d 503, 512 (9th Cir. 2001).

8           3.   The ALJ Did Not Adequately Discuss Findings as to Paragraph A

9           Plaintiff argues that as to Paragraph A of each Listing, her conditions affect her skin and

10  her joints, the latter of which to at least a moderate level of severity. ECF No. 11 at 3. She

11  further asserts that she has experienced malaise and fatigue. Id. Her reply brief identifies visits to

12  different physicians in 2021 based on nonspecific skin eruptions, joint pain and stiffness, and

13  fatigue. ECF No. 15 at 8-9 (citing AR 847-53).

14          Plaintiff's belated citation to supporting evidence reflects a deficiency in the decision

15  itself. Although the ALJ articulates his reasoning as to plaintiff's performance in broad areas of

16  mental functioning (AR 79), he does not provide any analysis as to Paragraph A requirements.

17  See AR 78. This includes manifestation of constitutional symptoms, which is required under both

18  Paragraphs A and B. See AR 78; 20 C.F.R. Subpar. P, App. 1, §§ 14.02(A)(2), (B), 14.06(A)(2),

19  (B). The ALJ therefore did not adequately discuss evidence that would be relevant to the analysis

20  of plaintiff's condition based on Appendix I. See Lewis, 236 F.3d at 512.

21          Defendant attempts to address this by citing the RFC analysis, where the ALJ discusses

22  various medical examinations lacking any signs of skin discoloration, pain, or tenderness. ECF

23  No. 14 at 5 (citing AR 83-86). Defendant argues that under Kaufmann v. Kijakazi, a court must

24  look "to all the pages of the ALJ's decision" when reviewing whether the ALJ met its evidentiary

25  burden. ECF No. 14 at 5 (quoting 32 F.4th 843, 851 (9th Cir. 2022) (emphasis original)).

26  Kaufman reviewed a district court's granting of a Rule 59(e) motion after realizing it had taken

27  one page about the plaintiff's subjective testimony out of context. 32 F.4th at 851. This does not

28  imply that a court must credit the ALJ's discussion of evidence anywhere in the decision

8

1  whenever applicable to an earlier step.  Such a rule would contravene the established structure of

2  an ALJ's analysis, which involves five steps that ALJs "follow in a set order."  20 C.F.R. §

3  416.920(a)(4).  They must proceed to the next step if and only if they cannot determine that the

4  claimant is or is not disabled at the current step.  Id.  An ALJ cannot rely on analysis occurring

5  after step three to justify his decision to not find plaintiff disabled at that step.

6      Finding otherwise would also undermine the distinction between the analysis occurring

7  before and after step three.  The ALJ admits that his analysis of mental limitations "at steps 2 and

8  3 of the sequential evaluation process" is not as detailed as "[t]he mental residual functional

9  capacity assessment used at steps 4 and 5".  AR 80.  This reflects the general rule that because an

10  RFC includes limitations from severe and nonsevere impairments alike, pre-RFC analysis "is not

11  meant to identify the impairments that should be taken into account[.]"  Buck v. Berryhill, 869

12  F.3d 1040, 1048-49 (9th Cir. 2017).  The review of medical evidence during the RFC analysis is

13  subject to a different standard than was applicable in step three.  Nor can the court assume the

14  ALJ intended for such analysis to apply retroactively to begin with.  See Molina, 674 F.3d at

15  1121 (holding that although the court cannot uphold a decision based on reasons the ALJ himself

16  did not articulate, a decision written "with 'less than ideal clarity'" should be upheld "if the

17  agency's path may reasonably be discerned.") (internal citations omitted).

18      The ALJ failed to articulate why plaintiff's condition did not meet the requirements of

19  Paragraph A of the Appendix I listing for either SLE or CTD.

20      4.  The Failure to Adequately Discuss Paragraph A is Not Harmless

21      An error is harmful when it has some consequence on the ultimate non-disability

22  determination.  Stout, 454 F.3d at 1055.  The Ninth Circuit has clarified that the "relevant

23  inquiry…is not whether the ALJ would have made a different decision absent any error…it is

24  whether the ALJ's decision remains legally valid, despite such error."  Carmickle v. Comm'r of

25  Soc. Sec. Admin, 533 F.3d 1155, 1162 (9th Cir. 2008).  For example, multiple reasons for a

26  particular conclusion can render an error in one harmless because the others provide "a basis for

27  the court to review the ALJ's decision[.]"  Id. at 1163; see also Lambert v. Saul, 980 F.3d 1266,

28  1278 (9th Cir. 2020) (refusing to find an error harmless when "the ALJ did not provide enough

9

1  'reasoning in order for us to meaningfully determine whether the ALJ's conclusions were

2  supported by substantial evidence[.]'") (internal citations omitted).

3        At step three, the ALJ failed to sufficiently analyze whether plaintiff's SLE or CTD met

4  the Paragraph A criteria for finding her automatically disabled.  This error was harmful.  Upon

5  remand, the ALJ must analyze the severity of the effect of these conditions on any disputed

6  organs or body systems, including plaintiff's skin and joints, as well as whether she experienced

7  any of the constitutional symptoms.

8        B.  <u>The ALJ Did Not Err in Discounting Plaintiff's Allegations of Pain and Dysfunction</u>

9        1.  <u>Plaintiff's Subjective Testimony</u>

10        Plaintiff earned a bachelor's degree in May 2011.  AR 163.  Her latest job was at GEO

11  Group as a secretary to the warden of prisons.  AR 164.  She testified that she was there for only

12  two weeks in December 2020 before developing what would later be identified as lupus

13  symptoms.  AR 163.  GEO Group kept her on the payroll through paid time off until asking her to

14  resign in early 2022.  AR 163.  Her previous job as a DNA coordinator and office services

15  technician for the Kern County Department of Child Support Services from March to June 2020,

16  was a largely sedentary position.  AR 164-66.  She left that job when the pandemic began because

17  she was already immunocompromised from a variety of problems.  AR 166.

18        The ALJ noted that plaintiff had rarely kept a job for over a year since 2011.  AR 181.

19  Plaintiff identified no overarching reason for her departures, but some were because she needed

20  10 hours of sleep per night due to narcolepsy and could not manage a long commute.  AR 181.

21        Plaintiff's physicians include Dr. Jasaleen Tiwana as her primary care physician, Dr.

22  Myers as her rheumatologist, Dr. Natalie as her neurologist, Dr. Paramour as her pain doctor, Dr.

23  Sandau as her sleep doctor and pulmonologist, an unidentified psychiatrist, and an unidentified

24  cardiologist.  AR 189-90.  Plaintiff does not have a therapist because she purportedly needs a

25  specialist in PTSD treatment, which is out-of-network for her insurance.  AR 190.  Said PTSD

26  stemmed from a February 2022 visit to the Mary Kay Shell Crisis Center to get her medication,

27  where she was held based on a false suspicion that she would kill herself.  AR 191.

28        Plaintiff testified that her lupus symptoms had worsened in the two years before the

10

hearing, even more so in the final month. AR 182. Muscle pain, joint pain, stiffness, and fatigue

would keep her from getting out of bed or off the couch, even to shower or wash her hair for days

at a time. AR 182. She also has low fever, hair loss, sores in the mouth and nose, facial rashes,

headache, brain fog, memory issues, and night sweats. AR 182. Until she hires a new caregiver,

which she has been without for a month and a half, she can barely do what she must to survive

and is otherwise living in filth. AR 182-83, 195. She spends 90% of the day on her back, and

having the energy to wash all her dishes counted as a "really good day". AR 196. She had four

or five of these days in July 2023, which would still constitute bad days for anyone else. AR 199.

Plaintiff therefore began taking Benlysta injections, a biologic injection that should yield

improvement after six months of use. AR 183. Because plaintiff took them for seven months

without improvement, aside from possibly from less joint pain, the doctor added a five-milligram

Prednisone steroid subscription. AR 183-84. The steroids somewhat help but are at too low a

dosage for her condition, yet overuse could result in skeletal damage. AR 184.

The ALJ noted that although Dr. Meyers diagnosed plaintiff with lupus and MCTD and

treating her accordingly, other doctors' opinions vary and some of the blood work does not reflect

usual signs for lupus. AR 184. Plaintiff replied she has no confidence in the four rheumatologists

in her hometown of Bakersfield, California, all "one-star doctors." AR 185. The ALJ asserted

that even Dr. Meyers' own notes seemed inconclusive, alternating between referring to plaintiff's

condition as lupus and as MCTD while trying to reconcile the negative findings. AR 185-86.

Plaintiff replied that Dr. Meyers confirmed she only has lupus during their last conversation, three

months before the hearing, and another appointment was scheduled for a week after. AR 185-86.

The ALJ then noted that in general, the latest medical records did not reflect the

symptoms that plaintiff alleged in her testimony. AR 187-88. When the ALJ noted that Dr.

Tiwana had noted no fatigue on July 26, 2023, plaintiff argued that must be in error because

plaintiff did report fatigue. AR 187-88.

Plaintiff uses a walker to move around. AR 188. Although she prefers carts when in a

store because they are taller, she sometimes needs a walker just to get from the parking lot to

inside the store. AR 188. Similarly, whether plaintiff uses her walker when she goes to a

doctor's appointment depends on whether she has the energy to get from her car to the waiting room chairs. AR 189. Plaintiff testified that she can drive a car normally but struggles to get in and out of one, usually holding the door to stabilize herself. AR 163. Plaintiff has bad days and good days, and on her best days she can walk the whole time. AR 189.

Aside from lupus and PTSD, plaintiff has Crohn's Disease, fibromyalgia, and narcolepsy with cataplexy. AR 192. The cataplexy is effectively paralysis when sleeping, but plaintiff can control this aspect with medicine. AR 192.

The ALJ initially could not determine whether the medical record included any doctor's confirmation that she had Crohn's Disease. AR 193. Plaintiff's counsel later confirmed that Dr. Tiwana and a gastroenterologist had diagnosed it after a recent CT scan of plaintiff's abdomen. AR 193, 195. This Crohn's disease "flares" as stomach pain, bloating, or diarrhea when plaintiff is either under a lot of stress or experiencing symptoms of her other conditions. AR 196-97.

The Seroquel and Neopax that plaintiff takes for her mental conditions has caused weight gain, with her psychiatrist categorically disliking Seroquel. AR 193-94. Without these medications, plaintiff would be crying in her closet all day, as opposed to having occasional flashbacks and nightmares. AR 195. Aside from brain fog, her trauma from interacting with people prevents her from making new connections and has delayed her finding a new caretaker. AR 198. Plaintiff also has migraine headaches which begin at unpredictable times but last all day, though Topomax helps manage them to a limited degree. AR 197-98. The Tramadol she takes when her pain is excessive also triggers her migraines. AR 197-98. When rating her pain on a 1-10 scale, scores in an average week consist of 2 on one day, 5 on three, and 7-8 on the other three. AR 200.

2. Physical Limitations Holding

The ALJ found that the evidence did not support plaintiff's subjective testimony as to the intensity, persistence, and limiting effects of symptoms. AR 82. Plaintiff can attend to her own hygiene, prepare her own simple meals, use a computer, handle a checkbook and savings account, drives, and socialize via telephone and digital communication. AR 82. The ALJ cited plaintiff driving to Coachella in April 2023 with her friend as an example. AR 82 (citing AR 3078).

The ALJ also held that the medical record, if anything, reflected an improvement in plaintiff's condition in recent years. AR 82. As to her narcolepsy with cataplexy, although plaintiff was treated for them years, her symptoms were well-controlled via Xyrem and Sunosi without significant side effects through March 2021. AR 82-83. Only when plaintiff could not have a Sunosi refill approved by insurance from April 2021 through June 2022 did she begin to experience daytime fatigue and tiredness. AR 83. Even then, pulmonary performance was normal between 2021 and 2023. AR 83. Plaintiff did not complain about fatigue through 2023, except in May 2023 when she admitted to missing a Xyrem dose and feeling tired the next day. AR 83 (citing AR 2966-67). Plaintiff's Epworth sleepiness scale score was an eight out of 24, with a score higher than 10 indicative of sleepiness. AR 83 (citing AR 2966).

The ALJ then addressed impairments purportedly linked to lupus, CTD, chronic pain syndrome, paresthesia of the skin, and myalgia. AR 83. March 2021 treatment notes did not show any musculoskeletal abnormalities. AR 83 (citing AR 1016). Examinations did not reveal any physiological signs of pain until July 2021, where she had mild swelling in bilateral fingers. AR 83 (citing AR 840, 844). She complained of joint pain later that month despite lack of swelling in the relevant joints. AR 83 (citing AR 840, 844).

Even when plaintiff was diagnosed with myalgia and paresthesia in September 2021, she had normal gait and full strength in all extremities. AR 83 (citing AR 2904, 2906). When an October 2021 nerve conduction study showed abnormalities in both bilateral upper extremities and the C5-C6 vertebrae, there were still no nerve entrapment neuropathies. AR 83-84 (citing AR 806). Treatment notes did not reflect any musculoskeletal irregularities in October or November 2021, but mild knee swelling in December. AR 84.

Brain imaging in January 2022 did not reveal any acute abnormalities, and an endocrinologist told plaintiff in February 2022 that she did not believe plaintiff had lupus. AR 84 (citing AR 1441). Antinuclear Antibody ("ANA") tests were positive but at low titers for lupus. AR 84, 1489. Dr. Samantha Madziarski reported plaintiff was fixated on getting a lupus diagnosis and had been consulting various doctors to find one who would give it. AR 84, 1488. A March 2022 MRI revealed minimal degenerative changes at the C5-6 vertebrae, but tests did

not reveal any other irregularities that could explain plaintiff's complaints of lower extremity pain and weakness. AR 84. She did begin physical therapy in March 2022 and reported no pain to Sukhpreet Sidhu twice in the following two months. AR 84, 1495, 2535, 2539. During a March 1, 2022 visit, however, Dr. Tiwana did note that because of plaintiff's lupus and resulting joint aches and pain, she might benefit from using a rollator walker. AR 84, 957.

In April 2022, plaintiff told Dr. Supneet Sandhu that the Imuran had reduced her joint pain, stiffness, and joint swelling. AR 84, 1772, 2932. Later that month, Dr. Bao Hunyh noted that although plaintiff used a roller walker, she has a normal range of motion and no tenderness in any joint. AR 85, 1892. Plaintiff underwent physical therapy from June to October 2022, which she did admit improved her pain. AR 85, 2504, 2506-07. Plaintiff also asserted in August 2022 that her pain was controlled with current medications and doing well. AR 85, 3024.

During a July 2022 visit, Dr. Sukhpreet noted that a rheumatologist had told plaintiff she did not have enough markers for an SLE diagnosis and instead had undifferentiated CTD. AR 85, 2578, 2580. Plaintiff told Dr. Sukhpreet she still believes she has SLE because of a butterfly rash that appears on her face when she's out in the sun. AR 85, 2578. Although plaintiff has since been treated for SLE, rheumatologist Dr. Myers has conducted all appointments via telemedicine and never physically examined her. AR 85 (citing AR 2687-813). The ALJ also noted "uncertainty" in the SLE diagnosis insofar as plaintiff had inconsistent objective markers, had low positive test results, and often did not respond to SLE treatments. AR 85.

The ALJ then held that although palpation of plaintiff's cervical facet revealed tenderness from the C3 to C7 vertebrae in November 2022, she did not have paresthesia or swelling the next two months. AR 85, 1522, 1555, 2610-11. From December 2022 through July 2023, plaintiff reported some knee pain but demonstrated no signs of fatigue, normal gait, no joint swelling or musculoskeletal tenderness, low levels of positive results for autoimmune markers consistent with SLE, and improvements in plaintiff's paresthesia and unrelated symptoms with medication. AR 85-86, 2601, 2602, 2610, 2669-71, 2938, 2940, 2989, 2891-92, 3074, 3089-90, 3102.

Overall, the ALJ concluded that while the medical record did reflect impairments that could result in the alleged symptoms, the longitudinal record showed those symptoms were not as

14

1   severe as plaintiff alleged.  AR 86.  Aside from mild-to-moderate test results, medication and

2   physical therapy appeared to successfully control plaintiff's pain and other symptoms.  AR 86.

3       3.   Mental Limitations Holding

4       The ALJ acknowledged that plaintiff has been diagnosed with borderline personality

5   disorder.  AR 86.  In February 2022, plaintiff exhibited a euthymic mood and affect, a logical and

6   linear thought process, and intact memory.  AR 86-87 (citing AR 2448).  The only abnormal

7   observation during an April 2022 visit was a panicky mood.  AR 87 (citing AR 2570).  This

8   improved by the following month and remained normal through January 2023.  AR 87 (citing AR

9   1431-32, 1435, 2552, 2555, 2558).  She even reported in October 2022 that she had started online

10  dating and it had been going well, notwithstanding one person ghosting her.  AR 87, 2555.

11  Normal mental status findings, fair judgment and insight, and a lack of suicidal or homicidal

12  ideation or hallucinations persisted through June 2023.  AR 87-88 (citing AR 2544-45, 2549-50,

13  2553, 2556, 2559-60, 2902).

14      The ALJ noted that in July 2023, plaintiff asserted that she did not believe her doctors

15  knew as much as she did about the effects and mechanisms for her SLE medication.  AR 87,

16  3074.  The report tied her argumentative nature as to medications and their half-life to her

17  borderline personality symptoms.  AR 87, 3074.  She insisted that she wanted to continue taking

18  Seroquel, despite the lack of clinical indication that she should and admonitions that it could lead

19  to heart problems given her other conditions.  AR 87, 3074.  The ALJ did acknowledge that

20  although plaintiff exhibited some signs of normal mental status, she was attention-seeking, had an

21  incongruent mood and affect, and exhibited poor judgment and insight.  AR 87, 3074.

22      Notwithstanding the July 2023 visit records and plaintiff's borderline personality disorder,

23  the ALJ summarized her mental status as "generally normal."  AR 87.

24      4.   Governing Legal Principles

25      In the Ninth Circuit, evaluating a claimant's testimony as to pain is a two-step process.

26  First, the claimant must provide "objective medical evidence of an underlying impairment 'which

27  could reasonably be expected to produce the pain or other symptoms alleged.'"  Garrison v.

28  Colvin, 759 F.3d 995, 1014 (9th Cir. 2014) (quoting Lingenfelter v. Astrue, 504 F.3d 1028,

1    1035–36 (9th Cir. 2007) (quoting <u>Bunnell v. Sullivan</u>, 947 F.2d 341, 344 (9th Cir.1991))).  The

2    claimant need not, however, provide evidence that the impairment would result in the same

3    degree of pain or other symptom as what the claimant alleges.  <u>Garrison</u>, 759 F.3d at 1014.

4            Second, if the claimant succeeds in providing objective evidence of the impairment and

5    "there is no evidence of malingering," the ALJ cannot reject the claimant's testimony about the

6    severity of such symptoms unless there is "'specific, clear and convincing reasons for doing so.'"

7    <u>Id.</u> at 1014-15 (quoting <u>Smolen v. Chater</u>, 80 F.3d 1273, 1281 (9th Cir. 1996)).  The clear and

8    convincing standard is "not an easy requirement to meet" and is in fact the most demanding

9    standard in such cases.  <u>Garrison</u>, 759 F.3d at 1015.

10           While an ALJ's credibility finding must be properly supported and sufficiently specific to

11   ensure a reviewing court the ALJ did not "arbitrarily discredit" a claimant's subjective

12   statements, an ALJ is also not "required to believe every allegation" of disability.  <u>Fair v. Bowen</u>,

13   885 F.2d 597, 603 (9th Cir. 1989); <u>Smartt v. Kijakazi</u>, 53 F.4th 489, 499 (9th Cir. 2022).[3]

14   Although an ALJ cannot reject complaints of pain solely due to "a lack of medical evidence

15   to *fully corroborate* the alleged severity of pain[,]"  it need not adopt such testimony when it

16   contradicts "objective medical evidence in the record[.]"  <u>Id.</u> at 498-99 (quoting <u>Burch</u>, 400 F.3d

17   at 680).  Evaluating the "intensity and persistence" of the symptoms of an impairment will

18   involve considering all available evidence, including "medical history, the medical signs and

19   laboratory findings, and statements about how…symptoms affect" the plaintiff.  20 C.F.R. §

20   404.1529(a).  Relevant factors include:

21               (ii) The location, duration, frequency, and intensity of your pain or
22               other symptoms; […]

23               (iv) The type, dosage, effectiveness, and side effects of any
     medication you take or have taken to alleviate your pain or other
24               symptoms;

---

25   [3]  In this regard, so long as substantial evidence supports an ALJ's credibility finding, a court
26   "may not engage in second-guessing."  <u>Thomas v. Barnhart</u>, 278 F.3d 947, 958 (9th Cir. 2002).
     Defendant argues that the clear and convincing standard in <u>Garrison</u> conflicts with this
27   "substantial evidence" standard, as articulated in 42 U.S.C. § 405(g).  ECF No. 14 at 10, n.11;
     759 F.3d at 1015.  Defendant conflates the evidentiary burden the ALJ must meet in its decision
28   with the standard of review that courts must apply when analyzing such decisions.

1

(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms; [and]

2

3

(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.);

4

5

20 C.F.R. § 404.1529(c). As to the fourth and fifth factors, the Ninth Circuit has held that

6

an ALJ can consider "unexplained, or inadequately explained, failure to seek treatment or follow

7

a prescribed course of treatment." Bunnell, 947 F.2d at 346 (quoting Fair, 885 F.2d at 603); see

8

also Plummer v. Berryhill, Case No. 2:16-cv-00753-AC, 2017 U.S. Dist. LEXIS 108184 at *16-

9

17, 2017 WL 2972461 at *6 (E.D. Cal. July 12, 2017) (agreeing with the ALJ that "failure to

10

pursue recommended treatment discredited…[plaintiff's] subjective testimony.").

11

5. Plaintiff's Challenge to 2022 Opinion That Plaintiff Did Not Have SLE

12

Plaintiff challenges the ALJ's reliance on a mid-2022 opinion from an unspecified

13

rheumatologist, which found that plaintiff did not have enough markers to for an SLE diagnosis

14

and instead had undifferentiated CTD. AR 85, 2578. Plaintiff argues this is not a contradiction

15

because SLE is a part of mixed CTD. ECF No. 11 at 4. As defendant notes, because the ALJ

16

found that plaintiff's conditions could result in the alleged symptoms, the question of what

17

precise condition she has is no longer relevant. ECF No. 14 at 12; AR 86. In either case, the

18

question is to what degree these impairments are disabling, and whether the medical records

19

support plaintiff's testimony to that effect. Smartt, 53 F.4th at 498-99; Matthews v. Shalala, 10

20

F.3d 678, 680 (9th Cir. 1993).

21

Plaintiff further argues that the nurse practitioner who told her she did not have SLE had

22

given her incorrect information and was subsequently fired, after which Dr. Huynh was the only

23

practitioner plaintiff saw at that facility. Id. Plaintiff cites no evidence in the record to

24

demonstrate that this particular nurse is an unreliable source, or that any practitioner she worked

25

with was fired for misinformation. In any case, the general reputation of a particular nurse is not

26

one of the enumerated factors an ALJ should use to evaluate a source's credibility. See infra

27

VI.C; 20 C.F.R. § 404.1520c(c). More important is how consistent any one record is with the

28

longitudinal history, something the ALJ directly noted when summarizing the evidence. AR 86;

17

1    20 C.F.R. § 404.1520c(b)(2), (c)(2).

2        6.  Dr. Myers' In-Person Examination of Plaintiff Does Not Affect the RFC

3        The ALJ discredited Dr. Myers' finding that plaintiff did have SLE because all of his

4    consultations were telephonic without any physical examination.  AR 85.  Plaintiff argues that Dr.

5    Myers did see her in-person in both January and November 2023.  ECF No. 11 at 4.  As

6    defendant notes in its opposition, the ALJ issued its decision one month before the second of

7    these visits.  ECF No. 14 at 12, n.12; AR 92.  Records of a post-decision visit were not available

8    to the ALJ and are therefore not relevant to whether he erred in reviewing the medical record.

9        Whether Dr. Myers' appointments were in-person or via telemedicine is irrelevant if his

10   notes from any in-person appointment do not disturb the ALJ's findings as to plaintiff's condition

11   and the severity thereof.  The ALJ's opinion generally emphasizes that aside from only certain

12   doctors acknowledging a lupus diagnosis, test results suggested the severity of such lupus was

13   minimal.  See AR 84-85.  Although Dr. Myers did treat plaintiff for lupus, the ALJ found the

14   diagnosis "uncertain" based on "inconsistent objective markers, low positive test results, and the

15   claimant's failure so far to respond to several different lupus medication treatments."  AR 85

16   (citing AR 2687-813).

17       Dr. Myers' notes on plaintiff's January 12, 2023 visit reinforce rather than refute this

18   assertion.  He lists lupus as the Reason for Visit and acknowledges the SLE diagnosis.  AR 2454.

19   He then noted, however, that multiple lab results were negative and "[c]omplements have been

20   normal on multiple checks."  AR 2454.  He also noted plaintiff's assertion that any medications

21   used thus far to treat lupus either did not address her current symptoms, had serious side effects,

22   or both.  AR 2454.

23       Dr. Myers' treatment notes also support the ALJ's general assertion that plaintiff has since

24   learned to manage her symptoms and pain through medication and physical therapy.  See AR 86.

25   After reviewing plaintiff's treatment history, he prescribed Benlysta while admonishing plaintiff

26   of it side effects.  AR 2454.  After some itchiness from the first dose, plaintiff began tolerating the

27   Benlysta well and reported some improvement in her symptoms.  See AR 2721-22.

28       Although Dr. Myers did acknowledge plaintiff had lupus during one in-person visit in

18

1  January 2023, his treatment notes during and since do not suggest an error in the ALJ's broader

2  analysis of plaintiff's condition.

3       7.  The ALJ Did Not Impermissibly Understate Plaintiff's Pain

4       To the extent that the ALJ disbelieves plaintiff's pain allegations based on the medical

5  record, plaintiff argues that pain ratings recorded at doctors' visits do not accurately reflect her

6  day-to-day pain.  ECF No. 11 at 5.  Specifically, she argues that her pain varies by day and by

7  what body part she is moving at that precise moment.  Id.  Doctors usually ask her to rate her pain

8  when it is at its lowest because she is sitting down.  Id.

9       Defendant argues that the ALJ was permitted to interpret the medical record as refuting

10  any claims of disabling symptoms to the extent that they were inconsistent.  ECF No. 14 at 10

11  (citing Smartt, 53 F.4th at 499).  Specifically, Defendant cites medical records showing that

12  plaintiff reported her pain as zero, three, or five out of then.  ECF No. 14 at 11 (citing AR 84, 85,

13  2535, 2539, 2504, 2506, 2508).  Plaintiff disputes the accuracy of any medical records asserting

14  that she ever rated her pain as 0 on a 1-10 scale.  ECF No. 15 at 7; AR 2535, 2539.  She asserts

15  without evidence that doctors at those appointments either did not ask her to rate her pain or

16  improperly recorded her response.  ECF No. 15 at 7.

17       With or without the 0 scores, whether the evidence is actually inconsistent with her

18  allegations of pain is unclear.  Plaintiff testified that her pain is a 2 on one day per week, 5 on

19  three, and 7-8 on the other three.  AR 200.  As defendant notes, some records show that plaintiff

20  reported pain as only a 5 or less.  AR 2504, 2506, 2508.  In others, however, plaintiff reported 6-8

21  pain without medication, only dropping to 2 with such medication.  AR 1525, 1529, 2998, 3010.

22  In one instance, plaintiff's pain started at 10 and reduced to 6 with medication.  AR 3132.

23       However, the ALJ did not directly discredit plaintiff's pain allegations.  Rather, he found

24  that the "physical examination findings" in general were "far less severe" than alleged, not pain

25  itself.  AR 86.  His only comment as to pain was that treatment notes reflected effective symptom

26  and pain control through medication and physical therapy.  AR 86.  The question becomes

27  whether the ALJ erred in this conclusion.

28  ////

1            8.    The ALJ Did Not Impermissibly Overstate Plaintiff's Response to Treatment

2            Plaintiff argues that by finding she can successfully control her pain and other symptoms

3    through medication and physical therapy, the ALJ understated the negative effects of such

4    treatment.  ECF No. 11 at 5; AR 86.  For example, the opioid pain reliever Tramadol makes her

5    sleepy and leaves her unable to drive, meaning she must organize her schedule around when her

6    pain is so bad that she is forced to take it.  ECF No. 11 at 5.  A potentially lethal interaction

7    between her Tramadol and her sleep medication Xywav prevents her from taking them within six

8    hours of each other.  ECF No. 15 at 7.  She therefore must choose between coping with the pain

9    and experiencing sleep attacks, cataplexy, and extreme drowsiness.  Id.  To the extent that the

10    ALJ implied plaintiff should continue physical therapy, plaintiff cites the VE's testimony that a

11    claimant who needs two days' absence from work per month to attend medical appointments

12    would be precluded from any sustained employment.  ECF No. 11 at 5; AR 204-05.

13            As defendant argues, plaintiff improperly presupposes that she cannot schedule physical

14    therapy outside of her work hours.  ECF No. 14 at 13.  The record provides no basis for this

15    assumption.  As to Tramadol, defendant notes multiple instances where plaintiff denied side

16    effects from her medication regimen in general.  Id.; AR 1525-26, 1529-30, 2998-99, 3010-11,

17    3132.  During one such visit in August 2022, plaintiff both "[d]enie[d] any other concerns" and

18    reported that while the medication does not cause the pain to go completely away, it does reduce

19    the pain to the point that it is no longer debilitating.  AR 85, 3022, 3024.  If plaintiff exhibited

20    side effects from pain relievers before or after the examinations, her failure to report any to her

21    doctors makes her solely responsible for their absence from the record.

22            The ALJ further noted that resurgences in plaintiff's symptoms, like daytime fatigue in

23    April 2021 and tiredness in May 2023, were sometimes caused by plaintiff's inability to either

24    obtain medication or remember to take it.  AR 83 (citing, e.g., AR 918, 922, 926, 2966).  The

25    Ninth Circuit permits ALJs to consider "unexplained, or inadequately explained, failure

26    to…follow a prescribed course of treatment."  Bunnell, 947 F.2d at 346 (citations omitted).

27    These notes also contradict plaintiff's assertion that she deliberately chooses not to take some

28    medications because of side effects or lethal interactions with others.  ECF No. 15 at 7.

1    Plaintiff adds in reply that steroids can also make her feel better, but will destroy her

2    bones and shorten her lifespan in the process. ECF No. 15 at 7. Plaintiff did testify to this side

3    effect of her Prednisone steroid subscription. AR 183-84. An ALJ, however, need only credit

4    plaintiff's testimony as to subjective pain she currently feels, not the possible effects in the future.

5    See Garrison, 759 F.3d at 1014-15. No authority suggests that the ALJ must acknowledge,

6    without supporting medical opinion, possible future side-effects of treatment or a plaintiff's sua

7    sponte decision to weigh those against the current efficacy of such medication. Nor must the

8    current treatment regimen be a "magic cure" without any side effects. See ECF No. 15 at 7.

9        9.  Plaintiff's Argument as to the ALJ's Analysis of Mental Symptoms is Inadequate

10    As defendant notes, plaintiff's objections to the ALJ's review of her mental status mostly

11    reiterate purported symptoms from her testimony, like brain fog and memory issues. ECF Nos.

12    11 at 5-6, 14 at 13; AR 182. She asserts that this has led to forgetting why she has begun a phone

13    call, getting in the car only to forget where she wants to go, limiting herself to microwavable

14    meals, taking forever to do what used to be easy, showering so infrequently that she often smells,

15    and spending the rest of her day after the hearing lying down to get energy back. ECF No. 11 at

16    5-7. She can do more on her best days but still asks for supervision to avoid dangerous mistakes.

17    Id. at 6.

18    Defendant responds that the record does not reflect some of these symptoms and outright

19    contradicts others. ECF No. 14 at 13-14. For example, the record says she emails almost every

20    day, texts daily, and appeared clean at every appointment she attended. Id. She also managed to

21    drive her friend to Coachella. Id. at 13 (citing AR 3078). Plaintiff responds that she only

22    "emails" insofar as she opens her emails and texts daily, reading any she received because she is

23    on mailing lists. ECF No. 15 at 4. She further argues that driving her friend to Coachella was a

24    singular event where she drove her friend, spent most of the trip recovering from the pain from

25    such minimal driving, and was told that she ruined the trip for her friend by not hiding her pain

26    more. ECF No. 15 at 3. As for the medical appointments, plaintiff asserts she just plans her

27    showers around them by resting extensively the days prior. Id. at 4.

28    Because "[c]ycles of improvement and debilitating symptoms are a common occurrence"

21

1   for a mental disability, the ALJ cannot reject a plaintiff's testimony merely due to this waxing and

2   waning.  Garrison, 759 F.3d at 1017.  When a person "suffers from severe panic attacks, anxiety,

3   and depression[,]" for example, improvement does not necessarily mean that that the mental

4   disability no longer affects the plaintiff's ability to function in the workplace.  Id. (citing Holohan

5   v. Massanari, 246 F.3d 1195, 1205 (9th Cir. 2001)).  Symptoms must be interpreted in the context

6   of the patient's overall well-being, with the understanding that symptoms that would prevent

7   someone from functioning in the workplace may not manifest "while being treated and while

8   limiting environmental stressors[.]"  Garrison, 759 F.3d at 1017.  This degree of caution is

9   especially merited when no medical expert has opined based on review of the full record that

10  plaintiff can return to work.  Id.

11      Plaintiff is therefore correct that one-off events like driving her friend to Coachella are

12  themselves inadequate to refute her testimony as to mental fog and fatigue.  The details of this

13  trip further undermine such an argument.  Plaintiff told Dr. Gerardo Perez that the original plan

14  was for her to only drive to LAX, with her friends driving the rest of the way.  AR 3078.  Those

15  friends gaslit and insulted her, and she was grateful to make it home despite the trip being a

16  "blessing in disguise".  AR 3078.  Whether a long drive is something plaintiff can safely do, as

17  opposed to something she was bullied into doing, is unclear from this event alone.

18      This observation does not, however, obviate the significance of a positive treatment

19  history in relation to mental health.  The court in Garrison contrasted "singl[ing] out a few periods

20  of temporary well-being from a sustained period of impairment" against "describe[ing]…

21  symptoms, course of treatment, and bouts of remission, and thereby chart[ing] a course of

22  improvement".  759 F.3d at 1018.  Accordingly, the court in Lenentine v. Kijakazi upheld an ALJ

23  decision that found "multiple specific examples" across a record void of symptom fluctuation to

24  discredit the plaintiff's allegations.  Case No. 23-00011 JAO-RT, 2023 U.S. Dist. LEXIS 170137

25  at *20, 2023 WL 6213361 at *8 (D. Haw. Sep. 25, 2023).  The same applies here, where the ALJ

26  noted that plaintiff had a panicky mood during one April 2022 visit but otherwise normal mood,

27  affect, judgment, and insight through June 2023.  See AR 86-88 (citations omitted).  Plaintiff's

28  claim that she is chronically fatigued but could consistently manage her energy across multiple

1   days to always appear alert during appointments strains credibility.  See ECF No. 15 at 3.

2          Admittedly, the ALJ could have interpreted plaintiff's abnormal mood, affect, and

3   judgment during a July 2023 visit as last-minute fluctuations that contradict the impression that

4   her symptoms were otherwise controlled.  AR 87, 3074.  ALJs may, however, consider a

5   plaintiff's "unexplained, or inadequately explained, failure to seek treatment or follow a

6   prescribed course of treatment."  Bunnell, 947 F.2d at 346.  Plaintiff did more than refuse to

7   follow doctors' advice; she actively argued that she knew more about her SLE medication and

8   wanted to continue taking it despite no proof of a medical need.  AR 3074.  Although plaintiff

9   argues that this discussion was less extensive than the doctor's notes suggest, this argument

10  inherently lacks support in the record.  See ECF No. 15 at 6.[4]

11         The ALJ permissibly discounted any subjective complaints from plaintiff's July 2023

12  visit, and comprehensively reviewed her history of normal mood and affect up to that point.  The

13  ALJ sufficiently justified his decision to discredit her testimony as to mental symptoms.

14        C.  Plaintiff Does Not Adequately Object to the Analysis of Dr. Tiwana's Opinion

15        1.  Medical Opinion

16         During a March 2022 visit to Dr. Tiwana, plaintiff told her that her SSI application was

17  denied.  AR 957.  In response, Dr. Tiwana opined that plaintiff's "lupus, fibromyalgia, chronic

18  migraine, narcolepsy and depression" prevented her from working as of that visit.  AR 957.  She

19  stated that plaintiff's joint aches would limit how much she could use her limbs, whereas her

20  focus was impaired by her migraines and depression.  AR 957.

21         Treating this as Dr. Tiwana's formal opinion[5], the ALJ found it unsupported by her own

22

23  [4]  Plaintiff similarly fails to show support for the assertion that this physician antagonized her about her weight.  See ECF No. 15 at 6.

24  [5]  The ALJ was arguably generous in considering this statement as an opinion favorable to

25  plaintiff's application.  Some courts do not credit unsigned medical reports as expert opinion evidence when determining disability.  Compare Fox v. Heckler, 776 F.2d 738, 742 (7th Cir.

26  1985) (finding that a report "completed and signed in accordance with…normal and usual procedures in evaluating a disability claim" must be treated as opinion evidence) with Valencia v.

27  Bowen, 691 F. Supp. 1120, 1125, n.2 (N.D. Ill. 1988) (not treating a state agency report as a medical opinion because it was "not signed and may not be a medical report at all.").  The

28  appointment notes at issue were "Not signed" by Dr. Tiwana.  AR 955.

examination findings.  AR 89.  Dr. Tiwana found no motor or sensory deficits and no tenderness

in any of plaintiff's extremities, all of which had full range of motion.  AR 89, 956.  Plaintiff had

a flat affect during the appointment but exhibited no acute distress, was alert and oriented, and

had no suicidal or homicidal ideation.  AR 89, 956.  As to consistency, other medical providers

had found "fairly normal mental and physical examination findings" including "normal gait,

normal strength, normal range of motion, and intact sensation".  AR 89.  Mental status

examination findings also consistently reflected normal attention and concentration.  AR 89.

2.  <u>Governing Legal Principles</u>

In evaluating medical opinion evidence, ALJs give no specific evidentiary weight to any

particular type of opinion or source, but instead must consider and evaluate the persuasiveness of

all medical opinions or prior administrative medical findings from medical sources and evaluate

their persuasiveness.  Revisions to Rules, 2017 WL 168819, 82 Fed. Reg. 5844, at 5867-68; <u>see</u>

20 C.F.R. § 404.1520c(a) and (b).  The factors for evaluating the persuasiveness of a physician

opinion include supportability, consistency, relationship with the claimant (including length of the

treatment, frequency of examinations, purpose of the treatment, extent of the treatment, and the

existence of an examination), specialization, and "other factors that tend to support or contradict a

medical opinion or prior administrative medical finding" (including, but not limited to, "evidence

showing a medical source has familiarity with the other evidence in the claim or an understanding

of our disability program's policies and evidentiary requirements").  20 C.F.R. § 404.1520c(c)(1)-

(5).  Supportability and consistency are the most important factors, and therefore the ALJ is

required to explain how both factors were considered.  20 C.F.R. § 404.1520c(b)(2).

Supportability and consistency are defined in the regulations as follows:

> Supportability. The more relevant the objective medical evidence
> and supporting explanations presented by a medical source are to
> support his or her medical opinion(s) or prior administrative medical
> finding(s), the more persuasive the medical opinions or prior
> administrative medical finding(s) will be.
> Consistency. The more consistent a medical opinion(s) or prior
> administrative medical finding(s) is with the evidence from other
> medical sources and nonmedical sources in the claim, the more
> persuasive the medical opinion(s) or prior administrative medical
> finding(s) will be.

1   20 C.F.R. § 404.1520c(c)(1)-(2).

2         The ALJ may, but is not required to, explain how the other factors were considered.  20

3   C.F.R. § 404.1520c(b)(2).  The Ninth Circuit has confirmed that the new regulatory framework

4   eliminates the "treating physician rule" and displaces the longstanding case law requiring an ALJ

5   to provide "specific and legitimate" or "clear and convincing" reasons for rejecting a treating or

6   examining doctor's opinion.  Woods v. Kijakazi, 32 F.4th 785 (9th Cir. 2022).  Still, in rejecting

7   any medical opinion as unsupported or inconsistent, an ALJ must provide an explanation

8   supported by substantial evidence.  Id.  In sum, the ALJ "must 'articulate ... how persuasive' [he

9   or she] finds 'all of the medical opinions' from each doctor or other source ... and 'explain how

10  [he or she] considered the supportability and consistency factors' in reaching these findings."  Id.

11  (citing 20 C.F.R. §§ 404.1520c(b), 404.1520(b)(2)).

12        3.  Dr. Tiwana's Relationship with Plaintiff Does Not Affect the ALJ's Analysis

13        Plaintiff argues that Dr. Tiwana, as her primary physician, saw her monthly from

14  December 2020 to Octboer 2023 and knows about the severity of all of plaintiff's health

15  conditions.  ECF No. 11 at 7.  She contrasts this against specialists she only met once every few

16  months to discuss one condition apiece.  Id.  Plaintiff further argues that Dr. Tiwana was the only

17  one who was thorough enough to even realize plaintiff needed a rheumatologist.  Id.

18        As defendant notes, whether plaintiff and Dr. Tiwana have an ongoing treatment

19  relationship was more relevant to applications filed before March 27, 2017.  ECF No. 14 at 16; 20

20  C.F.R. §§ 404.1527(a)(2), (c)(2).  At best, this is now one of three other factors that an ALJ can

21  discuss, but he is not required to do so unless deciding between two opinions with comparable

22  supportability and consistency.  20 C.F.R. §§ 404.1520c(b)(2)-(3), (c)(3).  Here the ALJ did not

23  find it necessary to analyze additional factors before concluding that Dr. Tiwana's opinion was

24  unpersuasive.  Plaintiff has failed to identify any error.

25        D.  Plaintiff's Use of a Walker Was Not Medically Necessary

26        The ALJ acknowledged that plaintiff testified to using a walker, and that the walker was

27  sometimes mentioned in the medical record.  AR 86.  However, other treatment notes reported

28  that her gait was normal.  AR 86 (citing AR 794, 798, 834, 1772, 1776, 1782, 1893, 2907, 3074).

The ALJ also found no documentation from a medical source showing that plaintiff needed an assistive device for 12 continuous months.  AR 86.  There was "no evidence establishing the need for a hand-held assistive device" or "describing the circumstances for which it is needed."  AR 86.  The ALJ therefore concluded the walker was not medically necessary.  AR 86.

Plaintiff argues that Dr. Tiwana ordered a walker because she needed one, and that Dr. Ghai agreed.  ECF No. 11 at 4.  She further explains that while she does not need one for short distances on good days, there are days where she does not even have the energy to stand without one.  Id.  Nor does plaintiff know in advance whether a particular day will be good or bad in this regard due to her SLE.  Id.

Both defendant and the ALJ seem to rely on 42 U.S.C. § 423(d)(1)(A), under which a physical impairment can only constitute "disability" if the condition "has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  See ECF No. 14 at 16.  This does not necessarily require that plaintiff needed an assistive device for 12 consecutive months, but rather that her general difficulties walking and standing have persisted for that long.  As discussed above, however, the ALJ reasonably found that that plaintiff's physical symptoms as a whole are not as severe as she alleged in her testimony.  See supra VI.B.2; AR 86.  Aside from the consistently normal gait undermining claims that she needs a walker, multiple visits revealed no swelling or tenderness in the relevant joints.  AR 83-85 (citing AR 840, 844, 1892).  The ALJ had also found that medication and physical therapy allowed plaintiff to adequately manage pain and other symptoms.  AR 86.

Whether Dr. Tiwana even said a walker was necessary to begin with is unclear.  During the February 2022 visit, she wrote that the clinic would help plaintiff obtain a rotator walker because "she may benefit from" one.  AR 957.  This may not equate to the device being necessary.  When combined with the review of plaintiff's general treatment history as to physical impairment, the ALJ was justified in finding that a walker was not medically necessary.

E.  Remand

The undersigned agrees with plaintiff that the ALJ erred by failing to analyze whether plaintiff's SLE or CTD met the Paragraph A criteria for finding her automatically disabled prior

1  to an RFC determination.  Whether plaintiff seeks remand for further proceedings or an order

2  directing the ALJ to award benefits is unclear.  However, it is for the ALJ to determine in the first

3  instance whether plaintiff has severe impairments and, ultimately, whether she is disabled under

4  the Act.  See Marsh v. Colvin, 792 F.3d 1170, 1173 (9th Cir. 2015) ("the decision on disability

5  rests with the ALJ and the Commissioner of the Social Security Administration in the first

6  instance, not with a district court").  "Remand for further administrative proceedings is

7  appropriate if enhancement of the record would be useful."  Benecke v. Barnhart, 379 F.3d 587,

8  593 (9th Cir. 2004).  When an ALJ outright failed to analyze a particular element of an SSI

9  application, as here, remand for further proceedings permits the ALJ to revisit the matter.  The

10  court finds that remand is the appropriate remedy.

11                                            VII.  CONCLUSION

12         For the reasons set forth above, IT IS HEREBY ORDERED that:

13         1.  Plaintiff's motion for summary judgment (ECF No. 11) is GRANTED;

14         2.  The Commissioner's cross-motion for summary judgment (ECF No. 14) is DENIED;

15         3.  This matter is REMANDED to the Commissioner for further consideration consistent

16  with this order; and

17         4.  The Clerk of the Court shall enter judgment for the plaintiff and close this case.

18  DATED: September 24, 2025

19

20                                              ALLISON CLAIRE

21                                              UNITED STATES MAGISTRATE JUDGE

22

23

24

25

26

27

28